AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

| | |
|---|---|
| United States of America | ) |
| v. | ) Case No.  11 - m - 41 |
| | ) |
| PRAVIN V. MEHTA | ) |
| | ) |
| ———————————————— | ) |
| *Defendant* | |

**UNITED STATES DISTRICT COURT**
**FILED**
**JAN 26 2011**
**MICHAEL J. ROEMER, CLERK**
**WESTERN**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

In or about  March, 2010, through in or about September, 2010  in the county of  Niagara , in the Western District of New York, the defendant violated  21  U.S.C. §§  841(a)  in that the defendant did:

knowingly, intentionally and unlawfully distribute schedule II, III and IV controlled substances by the issuance of prescriptions in a manner inconsistent with the usual course of medical practice and for other than legitimate medical purpose.

This criminal complaint is based on these facts:

☐  Continued on the attached sheet.

*Complainant's signature*

Joseph Cowell, Diversion Investigator,
U.S. Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  January 26, 2011

*Judge's signature*

City and State:   Buffalo, New York

H. KENNETH SCHROEDER, Jr.
*Printed name and title*

AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK   )
COUNTY OF ERIE      )   SS:
CITY OF BUFFALO     )

Joseph Cowell, being duly sworn, deposes and says:

1.   I am a Diversion Investigator (DI) for the United States Department of Justice, Drug Enforcement Administration, Buffalo Resident Office (DEA BRO), and have been so employed as such since May of 2004.   Prior to my employment as a DI, I was a sworn Police Officer/Narcotics Detective for twenty-two years with the Niagara Falls, New York, Municipal Police Department, and was assigned to the DEA BRO Task Force from 1997 thru 2004.   I am an investigative officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) who is empowered by law to conduct investigations of offenses enumerated in Title 21, United States Code, Section 801, et seq.

2.   During my law enforcement career, I have participated in numerous cases involving the unlawful distribution, sale, and possession of narcotics and controlled substances.   Also, as part of my previous and current employment with the DEA BRO, I successfully completed extensive law enforcement and DEA training, and numerous intensive courses covering most aspects of drug enforcement, including application for and execution of search and

1

seizure warrants as well as application for criminal complaints and execution of arrest warrants. I am also familiar with the manner by which controlled substances are unlawfully diverted, distributed, sold and used within the framework of drug trafficking and the manner by which drug traffickers use other persons and/or their personal property to facilitate their illegal activities.

3.    I am knowledgeable of the facts alleged in this affidavit based upon my personal participation in this investigation, as well from information provided to me by other law enforcement investigators of the Drug Enforcement Administration, Niagara Falls Police Department (NFPD), New York State Bureau of Narcotic Enforcement (NYS-BNE) and Medicaid Fraud Control Unit (NYS-MFCU). Not all of the information in this investigation has been included in this affidavit, but only those facts necessary to establish probable cause for the Court to issue a Criminal Complaint and Warrants in the forms annexed.

4.    I make this affidavit in support of a Criminal Complaint charging PRAVIN V. MEHTA, M.D., with violating Title 21, United States Code, Sections 841(a)(1) (unlawful distribution of a controlled substance).

5.    I have personally participated in the investigation of PRAVIN V. MEHTA, M.D.   As a result of my participation and review of past and present investigative reports by other law enforcement investigators involved in this investigation, and by analysis of information more fully described below, I am familiar with the facts and circumstances of this investigation.   On the basis of this familiarity, I allege the following facts to establish the grounds for the issuance of a criminal complaint.

## I. CRIMINAL CONDUCT

6.    The evidence describe below established that MEHTA has, as a matter of routine within his medical practice, unlawfully issued prescriptions for schedule II, III, and IV controlled substances that were dispensed to individuals outside the usual course of professional medical practice, and NOT for a legitimate medical purpose.

## BACKGROUND OF THE INVESTIGATION

7.    On November 13, 2009, the DEA-BRO initiated and coordinated a multi-agency joint investigation into MEHTA and his medical practice.   Investigation revealed that MEHTA is a medical

doctor, licensed since 1976 as a physician by New York State. MEHTA is registered with the United States Drug Enforcement Administration under DEA # AM7364742, and is duly authorized to prescribe and dispense controlled substances in schedules II through V within the legitimate practice of medicine and in accordance with established New York State and Federal laws. MEHTA advertises the medical specialties of endocrinology, diabetes and internal medicine and maintains a long standing private medical practice located at 550-552 Main Street, Niagara Falls, New York.

8.     The DEA-BRO has received complaints of excessive and unlawful prescribing of controlled substances by MEHTA from area law enforcement agencies.   These agencies include the New York State Police, Niagara County Sheriff Department-Drug Task Force, Niagara Falls Police Department, and the New York State Bureau of Narcotic Enforcement.   Historically, the BRO has received similar source and intelligence information concerning MEHTA'S over-prescribing of controlled substance "painkillers" from medical professionals, pharmacists, and private individuals within Niagara and Erie Counties.   Confidential sources and cooperating defendants have named MEHTA as a source of controlled substances where by a person can get any drug they want prescribed with little or no medical examinations, and that MEHTA is referred as "Dr. Feel Good."

**FEDERAL LAWS and REGULATIONS FOR THE ISSUANCE
OF PRESCRIPTIONS FOR A CONTROLLED SUBSTANCES**

9.    Federal  law  requires  that  "a  prescription  for  a
controlled  substance  to  be  effective  must  be  issued  for  a
legitimate medical purpose by an individual practitioner acting in
the  usual  course  of  his  professional  practice ...  An  order
purporting to be a prescription issued not in the usual course of
professional treatment or in legitimate authorized research is not
a prescription within the meaning and intent of Article 309 of this
Act and the person filling such a purported prescription, as well
as  the  person  issuing  it,  shall  be  subject  to  the  penalties
provided  for  violation  of  the  provisions  of  law  regulating
controlled  substances."  (21  C.F.R.  1306.04(a)).  Every  state,
including New York State, separately imposes the same requirement
under  its  laws.  Under  Federal  and  State  law,  for  a  doctor  to  be
acting in the usual course of professional practice, there must be
a bona-fide doctor/patient relationship.   For purposes of state
law, many state authorities, with the endorsement of medical
societies, consider the existence of the following four elements as
an  indication  that  a  legitimate  doctor/patient  relationship  has
been established:

    -A patient has a medical complaint;

    -A medical history has been taken;

    -A physical examination has been performed; and

-Some logical connection exists between the medical complaint, the medical history, the physical examination and the drug prescribed.

As previously stated, a prescription not issued in the usual course of professional practice or not for legitimate medical/research purposes is not considered valid. Both the practitioner and the pharmacy have a responsibility to ensure that only legitimate prescriptions are written and filled. Only practitioners acting in the usual course of their professional practice may prescribe controlled substances. These practitioners must be registered with DEA and licensed to prescribe controlled substances by the State(s) in which they practice.

10. All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address and registration number of the practitioner (21 C.F.R. 1306.05).

**THE INVESTIGATION**

**DATA**

11. On or about November 13, 2009, records were obtained from the New York State Bureau of Narcotic Enforcement's Prescription Monitoring Program (PMP). The records summarized the controlled

substances that were written under MEHTA's assigned DEA registration number, AM7364742. The data revealed at that between January 1, 2009, through November 13, 2009, a total of 16,371 prescriptions for controlled substances were dispensed pursuant to prescriptions issued by MEHTA. At that time, MEHTA was ranked as the second highest prescriber of controlled substances in all of New York State. Current PMP records reveal that MEHTA issued 19,400 controlled substance prescriptions between January 1, 2010, through October 28, 2010. MEHTA was the fifth highest prescriber (including institutions) of controlled substances in New York State and the second highest non-institutional practitioner. Moreover, a physician with specialties in endocrinology, diabetes and internal medicine, as advertized by MEHTA, typically would not routinely prescribe controlled substances, unlike physicians that specialize in pain management.

12. The investigation has determined that MEHTA does not employ any licensed licenced medical professions such as licensed practical nurses, registered nurses, physician assistants, or other medical doctors. The staff appears to consist solely of non-medical professional staff office such receptionists and secretaries. Further, the investigation has determined that some of MEHTA'S staff members were former patients. In any event, even if some of MEHTA'S staff were licensed in health care, they could

not issue prescriptions for controlled substances using MEHTA'S DEA
registration number. Each medical professional issuing
prescriptions for controlled substances must have their individual,
unique, DEA registration number.

**CONSENSUALLY RECORDED OFFICE VISITS**

13.  During the course of the investigation, eleven office
visits with MEHTA were consensually recorded during which MEHTA
prescribed control substances NOT in the usual course of
professional treatment.  These visits involved the use of two
independent confidential sources (herein referred to as CS-1 and
CS-2) and two independent undercover law enforcement officers
(herein identified as UC-1 and UC-2) posing as patients.  There
were no prior doctor/patient relationship between any of these
"patients" and MEHTA.  Thus, the first encounter between MEHTA and
each of the "patients" constituted "initial office visits" wherein
a legitimate doctor/patient encounter would involve considerable
discourse relating to patient medical history, past treatments
and/medications, and inquiry as to the source and symptoms for the
instant visit.  None of the initial encounters in this case
involved such legitimate medical practices on the part of MEHTA.
Rather, during minimal interaction, MEHTA merely determined what

general complaint the patient presented, what medication(s) the patient desired, and wrote the prescription.

**CS-1 Visits**

14.   During the month of March, 2010, NFPD Detectives Shawn Larrabee and Steve Reed met with a reliable confidential source (CS-1) in Niagara Falls, New York.  CS-1 was instructed to go to MEHTA'S office and attempt to obtain a prescription for pain pills. In sum and substance, the controlled meet, which was partially recorded (audio and video) revealed the following facts and circumstances:

CS-1 entered MEHTA'S office and remained  approximately one hour or more (most of which was spent in the waiting area) as witnessed by Detectives Larrabee and Reed.

CS-1 observed approximately 20 other patients while in the office.  Two receptionists/staffers were at or near the front counter area and exam room area. MEHTA was observed in the area as well.

CS-1 was taken to exam room #2 by a member of the MEHTA staff.  The employee took the CS-1's height, weight measurement, blood pressure, and a blood test for sugar (finger prick). CS-1 was instructed to wait for the doctor.

MEHTA later came into the exam room and asked the age of the CS-1, what the complaint of pain CS-1 had, and how it happened.  MEHTA instructed CS-1 to lift both legs and asked what hurt in each leg.  CS-1 responded with his/her age, complaint of a hurt back, and that CS-1 had gotten pain pills from a friend and needed more.  CS-1 lifted both legs for MEHTA. The exam was concluded, lasting approximately one minute.  Mehta took no medical history and, other than the leg lift, conducted no medical exam.

9

CS-1 was instructed to wait outside MEHTA's office area. Approximately 26 minutes later, Dr. MEHTA called CS-1 into his office and again asked CS-1 his/her age, nature of the complaint, and if CS-1 smoked or had any allergies. CS-1 responded to the questions and MEHTA then issued a prescription for 90 dosage units (D/U's) of 10mg Lortab hydrocodone - a schedule III controlled substance) and had the receptionist schedule a follow-up visit. Det. Larrabee stated that CS-1 then paid $85.00 to the receptionist for the office visit.

15.  During the month of April, 2010, NFPD Detective's Shawn Larrabee and Steve Reed again met with CS-1 in Niagara Falls. CS-1 was instructed to return to MEHTA'S office and attempt to obtain a prescription for pain pills.  In sum and substance the controlled meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

CS-1 entered MEHTA'S office and remained approximately three hours (most of which was spent in the waiting area) as witnessed by Detectives Larrabee and Reed.

CS-1 observed approximately 20 other reported patients in the office.  Two receptionists/nurses were at or near the front counter area and exam room area.  MEHTA was observed walking between the front counter area and exam rooms several times.

CS-1 was called to exam room #2 by a member of MEHTA'S staff. The employee took CS-1's height, weight measurement, and blood pressure. CS-1 was instructed to wait for the doctor.

MEHTA later came into the exam room and asked CS-1 how CS-1 was feeling.  CS-1 replied "ok" and CS-1 stated the he/she "needed more hydros".  MEHTA told the CS-1 to wait in the hallway near his office.  A prescription for 90 D/U's,10mg hydrocodone was filled out by the receptionist and signed by MEHTA.  MEHTA asked CS-1 if CS-1 had Medicaid. CS-1 replied, "no".  MEHTA encouraged the CS to obtain Medicaid coverage so that CS-1 could get an MRI done, and that without Medicaid the MRI exam would cost $1000.00.  The

exam with MEHTA lasted 1-2 minutes and involved no medical exam, testing or discourse beyond the question of how CS-1 was feeling. CS-1 was scheduled for a follow-up visit.

Det. Larrabee stated that CS-1 then paid $85.00 to the receptionist for the office visit.

16.   During the month of June, 2010, NFPD Detective's Shawn Larrabee and Steve Reed met with CS-1 in Niagara Falls.  CS-1 was instructed to return to MEHTA'S office and attempt to obtain a prescription for pain pills.  In sum and substance the controlled meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

CS-1 entered MEHTA'S office and remained approximately two hours and thirty minutes (most of which was spent in the waiting area) as witnessed by Detectives Larrabee and Reed.

CS-1 observed approximately 15 other patients in the office.   Two receptionists/staffers were at or near the front counter area and exam room area.   MEHTA was observed walking between the front counter area and exam rooms several times.

CS-1 was called to an exam room by a member of MEHTA'S staff.   The employee took the CS-1's weight measurement. CS-1 was instructed to wait for the doctor.

MEHTA later came into the exam room and CS-1 told  MEHTA, "I need my script refilled".  MEHTA told CS-1 to follow him and then to wait in the hallway outside the private office area.   Approximately eight minutes and thirty seconds later, MEHTA called CS-1 into his office and issued a prescription for 90 D/U's, 10mg hydrocodone.   The prescription was filled out by the receptionist and signed by MEHTA.  MEHTA asked CS-1 where CS-1 was were working and CS-1 was scheduled for a follow-up visit.

Detective Larrabee stated that CS-1 then paid $85.00 to the receptionist for the office visit.

11

17.   During the month of July, 2010, NFPD Detective's Shawn Larrabee and Thomas Rodriguez again met with CS-1 in Niagara Falls. CS-1 was again instructed to return to MEHTA'S office and attempt to obtain a prescription for pain pills.  In sum and substance the controlled meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

> CS-1 entered the MEHTA medical office and remained approximately one hour and thirty minutes (mostly in the waiting area) as witnessed by Detectives Larrabee and Rodriguez.

> CS-1 observed approximately 12 other patients while in the office.  One receptionist/staffer was at or near the front counter area and exam room area.  MEHTA was observed walking between the front counter area and exam rooms several times.

> CS-1 was called to an exam room by a member of MEHTA'S staff.  The employee took CS-1's weight measurement.  CS-1 was instructed to wait for the doctor.

> MEHTA later came into the exam room and CS-1 told MEHTA "I just needed my script refilled and I got a job interview to go to."  The encounter lasted approximately 32 seconds. MEHTA told CS-1 to follow him into his private office.  In that office, MEHTA filled out some paperwork and, after approximately 75 seconds, MEHTA directed CS-1 to go to the reception area.  At the reception area, an employee filled out the prescription for 90 D/U's, 10 mg hydrocodone, which MEHTA then signed.  CS-1 was scheduled for a follow-up visit.

> Detective Larrabee stated that CS-1 paid $85.00 to the receptionist for the office visit.

**CS-1 and UC-2 Office Visits**

18.   During the month of August, 2010, NFPD Detective's Shawn
Larrabee and Joseph Giaquinto met with CS-1 in Niagara Falls.  CS-1
was instructed to take UC-2, an officer from the NCSD-DTF, acting
in an undercover capacity, to MEHTA'S office and attempt to obtain
a prescription for pain pills.  In sum and substance the controlled
meet (audio and video recorded) revealed the following facts and
circumstances:

> UC-2 and CS-1 entered MEHTA'S office.   Approximately 32
> minutes after CS-1 signed in, a member of MEHTA'S staff
> requested a urine sample from CS-1 in order to determine if
> CS-1 was taking the medications that were previously
> prescribed.   CS-1 provided a urine sample.   CS-1 advised
> the staff that he/she had not taken any hydrocodone tablets
> in six days because CS-1 had run out of pills.   CS-1
> advised that he/she was taking more tablets than he/she was
> supposed to and was going to ask the doctor to write a
> prescription for a larger quantity.   The staff member
> advised CS-1 that it never hurts to ask.

> UC-2 engaged in conversation with an unknown female subject
> that was waiting to see MEHTA.   The unknown female stated
> that the staff was urine testing everyone and the reason
> was due to patients being "busted" for taking their
> prescriptions to Buffalo and selling them illegally.   The
> unknown female stated that she had been busted for it
> herself.

> UC-2 accompanied CS-1 into an exam room.   A staff member
> had the CS-1 step on a scale and recorded CS-1's weight,
> asked for CS-1's height, and left the room.   A short time
> later MEHTA entered the exam room and asked CS-1 how he/she
> was doing.   CS-1 replied that his/her back hurt.   CS-1
> advised that his/her pills were not lasting.   CS-1 and UC-2
> followed MEHTA into his private office.   Once in the
> office, the CS-1 asked MEHTA if MEHTA would see UC-2 and
> write UC-2 a prescription for hydrocodone because UC-2 had
> injured his/her back.   MEHTA advised UC-2 that they would

have to make an appointment with Dawn (FIGURILLI) to see
him. CS-1 told MEHTA that UC-2 did not have insurance or
much money. MEHTA asked UC-2 what he/she was are doing.
UC-2 replied that he/she cleans (hotel) rooms and lives
with CS-1.

CS-1 asked MEHTA to write a prescription for a larger
quantity so that CS-1 could give pills to UC-2. MEHTA
agreed to give one (a prescription for hydrocodone) for 120
tablets (an increase from the 90 tablets previously
prescribed for CS-1) "only this month" to CS-1 and CS-1
could help UC-2 out with some pills. MEHTA advised that he
could not give CS-2 this every month (meaning the
prescription with increased D/U's). MEHTA then told CS-1
to go and pay Dawn.

CS-1 made a cash payment of $85.00 and was subsequently
given the prescription for 120 D/U's of hydrocodone. CS-1
then scheduled for a follow-up visit for September, 2010.

19.   During the month of September, 2010, NFPD Detective's

Shawn Larrabee and TFO Chris Clark met with CS-1 in Niagara Falls.

CS-1 was instructed to return with UC-2 to MEHTA'S office and

attempt to obtain a prescription for pain pills. In sum and

substance the controlled meet revealed the following facts and

circumstances:

UC-2 and CS-1 entered MEHTA'S office. CS-1 signed in at
the waiting room window. Approximately one hour and twenty
three minutes later, UC-2 accompanied CS-1 into an exam
room. A female staff member took CS-1's weight and blood
pressure and left the room. MEHTA entered the exam room
and stated that CS-1 sounded congested and then listened to
CS-1's lungs while CS-1 breathed. CS-1 and UC-2 then
accompanied MEHTA into MEHTA's private office.

UC-2 advised MEHTA that next month UC-2 would be able to
see MEHTA as a patient and UC-2 had taken the "extra"
hydrocodone that MEHTA had prescribed for CS-1 the previous
visit. UC-2 and CS-1 asked MEHTA if he would write CS-1 a
prescription for the same quantity as last time. MEHTA
asked CS-1 how many pills he gave them last time. MEHTA

14

was told the prescription was for 120 tablets (hydrocodone). MEHTA mumbled something unintelligible and asked if CS-1 took a tox-screen last visit. MEHTA left the office and CS-1 went to pay at the front of the waiting room. CS-1 paid a female employee $85.00 at the front waiting room.

CS-1 and UC-2 went to a back room and were informed by a female employee that CS-1 would not be getting a Lortab prescription on this visit because CS-1 had failed the urine test due to cocaine being in CS-1's system. The employee advised that they are not allowed to prescribe narcotics to anyone with cocaine in their system and they could get into trouble if the State came in and reviewed CS-1's chart.

CS-1 denied using cocaine and stated that he/she handled it a lot. The employee and MEHTA agreed that the cocaine could be absorbed through the skin. MEHTA then offered to prescribe something else. MEHTA then prescribed 120 D/U's of Ultram (pain medication but not a controlled substance) and Amoxicillin. The employee wrote out the prescriptions that were signed by MEHTA.

20.   It is believed that during the period between the August and September office visits, MEHTA received information from sources that he was under investigation by law enforcement. This is based on inquires that were made by local attorneys to law enforcement officers and members of the United States Attorney's Office.

**CS-2 Office Visits**

21.   During the month of August, 2010, NCDTF Investigators Shiesley and McAuliffe met with a reliable confidential source (CS-2) in Niagara Falls, New York. CS-2 was instructed to go to the office of MEHTA and attempt to obtain a prescription for pain

pills.  In sum and substance the controlled meet (audio recorded) revealed the following facts and circumstances:

> CS-2 entered MEHTA'S office for a previously scheduled appointment.  Approximately one hour later, Inv. Shiesley observed MEHTA enter the medical office through the side door.

> CS-2 was taken to an exam room and for height and weight measurements by a MEHTA staff member.

> MEHTA entered the exam room and talked to CS-2 for approximately two minutes during which time MEHTA listened to CS-2's chest.  MEHTA asked about CS-2's major complaint.  CS-2 replied that he/she had two broken ribs when hit by a car, two herniated discs in his/her back, experienced panic attacks and had asthma.

> CS-2 then went into MEHTA's private office where CS-2 spent approximately four minutes answering several more questions from MEHTA.  CS-2 received five prescriptions consisting of Lortab, Xanax, Motrin, an inhaler and a topical cream.

There was no discussion as to past treatments undertaken and/or medications previously taken by CS-2.

22.  During the month of September, 2010, NCDTF Investigators Shiesley and McAuliffe met with CS-2 in Niagara Falls.  CS-2 was instructed to return to MEHTA's office and attempt to obtain a prescription for pain pills.  In sum and substance, the controlled meet (audio recorded) revealed the following facts and circumstances:

> CS-2 entered MEHTA'S office for a previously scheduled appointment.  CS-2 was taken to an exam room and his/her weight was taken by an employee.

16

MEHTA entered the exam room and asked CS-2 how CS-2 was doing and if CS-2 is still having back pain. CS-2 advised that CS-2 is going to start physical therapy. MEHTA advised CS-2 to come to his office.

In the office, MEHTA and CS-2 talk for approximately four minutes and thirty seconds during which time MEHTA questioned CS-2 about an CS-2 emergency room visit that previously occurred. CS-2 advised that CS-2 was treated for Radial Nerve Dysfunction and Blisters on the feet. MEHTA questioned why there was no medication in CS-2's system. CS-2 advised he/she was out of the country for 8 days and had not taken any medication. MEHTA mentioned an MRI and CS-2 offered to take an MRI. CS-2 and MEHTA further discussed the cost and insurance for the MRI.

MEHTA questioned CS-2 if it was the back that mostly bothered CS-2. CS-2 stated his/her issue was with L-4 and L-5 and the pain was in the right leg down to the ankle. MEHTA advised he would send the CS-2 for an MRI. CS-2 advised MEHTA that the Lortab was not getting the nerve pain enough and instead of the Lortab, CS-2 asked for a low dose of Oxycontin. MEHTA advised that he would prescribe Oxycontin 20mg, but the CS-2 requested a stronger dose of 40mg. MEHTA consented to CS-2's request and stated that he would give (a prescription) to CS-2 for Oxy 40mgs and further asked CS-2 if that is all CS-2 needs instead of Lortab. The CS-2 advised that he/she did not want Lortab. MEHTA then references the Xanax that the CS-2 uses and discussed the inhaler (previous prescription) that had refills left on the original script. MEHTA asked CS-2 if CS-2 wanted Motrin also. The CS-2 replied, "no." CS-2 subsequently left MEHTA's office and went to the front reception area.

CS-2 asked a staff member if people take both Lortab and Oxycodone. The staff employee stated "yes." CS-2 stated that he/she discussed with MEHTA that CS-2 wanted to go down to 10mg's but did not know if MEHTA had heard CS-2 because MEHTA was writing while CS-2 was speaking. The staff member advised CS-2 that CS-2 was getting Oxycontin 40mg and asked if they wanted Lortab 10/500 also. CS-2 advised that he/sh did want the Lortab.

CS-2 paid $85.00 to an office employee and received a receipt and the three prescriptions for Oxycodone, Lortab and Xanax.

17

**UC-1 Office Visits**

23.   UC-1 is employed by the NYS-MFCU as a special investigator.   MEHTA'S high rate of prescribing controlled substances was a concern to the NYS-MFCU because many of the patients "treating" with MEHTA are covered by Medicaid.   Medicaid is a federal and state funded program which provides payment for certain medical treatments and related items, including the cost of prescription drugs, for certain eligible individuals.

24.   Fidelis is a private company that administrates a portion of the New York State Medicaid plan under a contract, known as a "Medical Managed Care Agreement," with the New York State Department of Health.   Fidelis oversees payments to health care providers for physician services to Medicaid enrolled patients. Covered individuals are issued identification cards by Fidelis.   A medical provider submits claims for payment for services, including office visits, to Fidelis for covered individuals.   Medicaid does not utilize a plan administrator to pay for prescriptions drugs. Rather, Medicaid directly reimburses pharmacies for prescription drugs dispensed to Medicaid patients.

25.   During the month of June, 2010, UC-1 attended a scheduled appointment at MEHTA'S office.    UC-1 claimed to be covered by Medicaid and possessed a Fidelis Insurance card.   As shown below, because UC-1 was covered by Fidelis, MEHTA sought to have UC-1 undergo tests that he did not even mention to the non-insured, cash paying "patients." Some of the tests recommended to UC-1 by MEHTA are tests MEHTA could administer and generate revenue for his office through Medicaid/Fidelis billing.   In sum and substance the UC-1 controlled meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

> Approximately 45 minutes after entering, UC-1 presented a Fidelis insurance card to a female employee who used an office computer to check the card.
>
> Approximately 15 minutes later, a second female employee summoned UC-1 to an exam room and took UC-1's height and weight. The female advised UC-1 that because UC-1 was a new patient, an overall health check needed to be done.   This included a sugar test, blood pressure, EKG, and a Doppler test.   UC-1 submitted to the finger prick glucose test and refused the EKG.
>
> MEHTA came into the exam room and had conversation with UC-1 and asked UC-1 to perform individual leg lifts.   MEHTA left the room and the female took the blood pressure of UC-1. UC-1 refused a Doppler test from the female employee.
>
> MEHTA came back into the exam room and told UC-1 that it is important to take the EKG and other tests.   MEHTA used a stethoscope on UC-1's chest and checked the blood pressure of the UC-1 and stated it looked fine.   MEHTA took two vials of blood and told UC-1 of the importance of the tests.   MEHTA advised that the recommended testing is done on all the patients.   MEHTA further referenced narcotic medicine and the need to do all the tests, blood work and an MRI.   The female employee stated that if something went wrong and MEHTA had prescribed narcotics without the test, MEHTA could get in "a lot of trouble."   UC-1 refused to

19

take the EKG test and advised that the other tests would be done during the next visit. MEHTA agreed to prescribe medication for UC-1 this time but would not if the tests were not done next time.

UC-1 was then instructed to proceed to MEHTA's private office where MEHTA asked questions relative to UC-1's age, pain, prior medication, smoking, drinking and allergies. UC-1 stated that his back pain started two months ago and was from lifting boxes. UC-1 stated he/she had been taking Lortab and Vicoden ES.

MEHTA advised that he was going to issue a prescription for 56 tablets (10/500) of Lortab. MEHTA stated that he is not supposed to write this medicine without all the tests being completed and he advised that UC-1 must go for an MRI before the next appointment. MEHTA took UC-1 to the front desk and instructed a female staff employee to give UC-1 a letter for the MRI test and the prescription for Lortab. MEHTA left the company of UC-1. The female staff advised UC-1 that they needed to get the MRI done before the next visit and would be getting a phone call from Seton Imaging to set up the MRI appointment. UC-1 was given the prescription for Lortab, Seton Imaging paperwork, and appointment card for the next office visit.

26. Subsequent investigation revealed that MEHTA billed Fidelis not only for the office visit, but for an EKG that was NOT administered. As a result, Fidelis paid MEHTA $174.57 for the office visit and EKG.

27. During the month of July, 2010, UC-1 attended a second scheduled appointment at MEHTA'S office. UC-1 entered the office and signed in at the counter. In sum and substance the UC-1 meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

20

A female employee took UC-1 to an examination room.  The employee checked UC-1's height and weight and left the room.  Several minutes later, MEHTA entered with the UC-1 patient file and asked if UC-1 went for the MRI test.  UC-1 claimed that he/she had an appointment for later that week.  MEHTA advised UC-1 to go to the MRI this week.  MEHTA instructed UC-1 to go to MEHTA's private office.

UC-1 went to MEHTA'S office and waited.  Several minutes later, MEHTA came in and asked when UC-1 would be having the MRI.  UC-1 again responded with a date later in the week.  MEHTA reviewed a blood work report and stated that UC-1's cholesterol was high and that UC-1's sugar was also high but not that bad.  MEHTA advised that the cholesterol needed to be lower and that he wanted UC-1 to go for another blood test involving fasting.

MEHTA then took UC-1 to the front desk area where another female employee was located.  MEHTA wrote several prescriptions.  MEHTA advised UC-1 that one prescription was for cholesterol.  MEHTA advised UC-1 to fast and go for another blood test.  The female employee asked MEHTA if UC-1 was going for the MRI test and reminded MEHTA that last time UC-1 did not want to take any test.  MEHTA replied "Oh yes, he was scared."  MEHTA then advised UC-1 that he would see UC-1 in a month.  MEHTA then left the room.  UC-1 was scheduled for another appointment and the female employee gave UC-1 prescriptions for Lortab 10/500, 56 DU's, and Crestor (cholesterol medication) 20 mg, 30 DU's (five refills), Trilipex 135 mg, 30 DU's (five refills), and lab testing orders.

28.  During the month of August, 2010, UC-1 attended a third scheduled appointment at MEHTA'S office.  UC-1 entered the offices and signed in at the counter.  In sum and substance the UC-1 meet, which was partially recorded (audio and video), revealed the following facts and circumstances:

A female employee took UC-1 to an examination room. The employee checked the weight of UC-1 and left the room.

21

Several minutes later, MEHTA entered and told UC-1 to sit on the exam table.  MEHTA then answered a cell phone call. Upon completing the call, MEHTA asked UC-1 how UC-1 was doing.  UC-1 answered "good."  MEHTA checked UC-1's blood pressure and instructed UC-1 to go to MEHTA'S private office.

In the office, MEHTA reviewed UC-1's patient file and informed UC-1 about the high cholesterol and asked UC-1 if UC-1 had gone for a blood test.  UC-1 advised that he/she is taking the cholesterol pills but did not go for the blood test because of a religious holiday.  UC-1 advised MEHTA that he/she would go for the blood test the first day after the religious holiday.  UC-1 asked MEHTA for a refill for the Lortab because UC-1 was going to Florida.  MEHTA stated that he would give UC-1 a two month supply.  MEHTA asked if UC-1 had gone for the MRI for his/her back.  UC-1 advised it be done later.  MEHTA told UC-1 that they (meaning the insurance company) will ask about it because UC-1 is getting pain medicine and they will also want UC-1 to go for X-Rays.  MEHTA then wrote some notes and took UC-1 to the front desk.

At the front desk, MEHTA advised a female employee to give one refill for the pain medicine, and schedule an appointment in two months.  The female advised MEHTA that UC-1 had yet to do the physical, MRI, and cardiogram. MEHTA responded, "he didn't do it yet?"  The female answered "no" and that every time UC-1 says he will do it next time.  MEHTA advised UC-1 that Fidelis requires the testing.  UC-1 asked MEHTA if the tests were required by the insurance company.  Dr. MEHTA answered "yes" and further stated, "you have to do it ... otherwise you won't be allowed to come here."  MEHTA laughed and referenced the MRI, back pain, and UC-1 getting pain medicine.  MEHTA stated, "we can't give you pain medicine without doing the MRI."  The female employee attempted to get UC-1 to go for the MRI. UC-1 refused because of a religious holiday.

The female employee asked MEHTA which prescription to give UC-1.  MEHTA asked, "Do you have your cholesterol pills?" UC-1 answered, "yes."  Dr.MEHTA advised the employee to give UC-1 a slip for blood work.  MEHTA advised that the blood work could be done at the hospital.  MEHTA left the front desk area and the female employee gave UC-1 a prescription for 56 D/U's of Lortab (with one refill), and a pre-stamped prescription order for blood work.  The

employee verified UC-1's address and set an appointment date.

## PROFESSIONAL MEDICAL ANALYSIS/OPINION OF CS/UC OFFICE VISITS

29.   During the course of the investigation, a medical expert was retained to provide an opinion to within a reasonable degree of medical certainty as to whether the prescribing of controlled substances by MEHTA during the office visits described above was consistent with the usual course of medical practice, and whether the prescribing was for a legitimate medical purpose.   Theodore Parran, MD, FACP, was retained for the analysis.   Dr. Parran is an Associate Clinical Professor of Medicine at the Case Western Reserve University School of Medicine.

30.   Dr. Parran is a board-certified internist who practices general internal medicine and addiction medicine in Cleveland Ohio. In addition Dr. Parran is on the faculty of CWRU School of Medicine as an Associate Professor of Medicine and Family Medicine.   Dr. Parran teaches in several residency programs, directs the Program in Continuing Medical Education, and in the past has directed the Addiction Fellowship Programs.   Dr. Parran has performed research and written educational materials about addiction and controlled drug prescribing, and has served as a consultant to various pain management programs since the mid 1980's.   In addition, Dr. Parran

has presented educational sessions on pain management and addiction issues throughout the country, and has developed and have directed for eighteen years one of the most widely acclaimed remedial education courses for physicians identified as having problems with their controlled drug prescribing in the nation.    Attached as exhibit 1 is a copy of Dr. Parran's academic C.V. and a list of legal cases, including several federal court criminal trials, that Dr. Parran has provided an expert opinion[1].

31.   Dr. Parran was provided with copies of written reports, transcripts and electronic video and audio evidence that was obtained during the course of the investigation.   On December 22, 2010, Dr. Parran issued a report in which he concluded that each of the patient visits wherein MEHTA prescribed controlled substances was NOT in the course of legitimate medical treatment.   The report (attached as exhibit 2) contains a series of general findings and an individual analysis of each CS/UC office visit, the general findings of Dr. Parran are reported as follows:

---

[1] It should be noted that in regards to Dr. Parran's employment with the Veteran Administration's Stokes Cleveland Hospital, the Inspector General for the U.S. Department of Veteran's Affairs conducted an investigation as to whether Parran used VA fellows in his private practice or billed the fellows work as his own.   Parran resigned his position with the VA hospital in 2008.   In 2009, the United States Attorney Office in Cleveland, Ohio, declined prosecution of Parran.

"After reviewing the materials provided from visits to Dr. Mehta's Office, I am very concerned.  My findings, to within a reasonable degree of medical certainty, are that there appears to be not a single instance in the visits reviewed where the prescribing of controlled drugs by Dr. Mehta appears to have been done within the usual course of medical practice, and for a legitimate medical purpose.  I will discuss specific office visit details upon which my opinions are formed, but I will first list the general characteristics that are concerning:

1) There are no old records obtained, and no evidence of any attempt to obtain them, despite patients with chronic pain complaints.

2) There is an exceedingly scant - basically non-existent - initial history and initial physical exam done on patients, no patient was asked to undress and wear a gown, and there is no any evidence of a neurologic exam/extremity exam/or a musculoskeletal exam ever being done.

4) (number out of sequence in report) There are no consultations ordered.

5) There are several visits when the patient failed to follow-through on the cursory ordering of tests by Dr. Mehta, despite warnings that this would result in no more prescriptions - yet prescriptions were made anyway.

6) Dr. Mehta gave extra controlled drug tablets to one patient after hearing that the expressed intent of the patient was to share them with her friend who did not have the money for her own office visit at that time.

7) One U.C. patient asked for medications by name and then specified the dose (40 mg of OxyContin) and the doctor complied.

8) A substantial amount of information is provided indicating that Dr. Mehta wrote controlled drug prescriptions, or left pre-signed prescriptions to be given to patients when the doctor was out of the country traveling.

9) All of this took place in the face of the doctor having had an investigation of his employees within the previous six months for allegations of forging of controlled drug prescriptions.

10) All of this taking place in the office of Dr. Mehta who prescribed the second most controlled drugs of any physician in the

26

State of New York.   It is inconceivable that a sole primary care physician would be the second leading prescriber of controlled opioids in the State of New York, and that this prescribing would be done in a manner consistent with the usual course of medical practice."

32.   Based on the "General Findings" analysis Dr. Parran concluded:

"Prescribing controlled drugs for pain complaints in the presence of these sorts of behaviors (or lack of clinical behaviors) on the part of Dr. Mehta is not consistent with the usual course of medical practice, and appears to be prescribing of controlled drugs for other than legitimate medical purpose.   In addition, to within a reasonable degree of medical certainty, the prescribing patterns seen on under-cover recordings from the office indicate controlled drug prescribing that endangers the health and safety of individual patients and can threaten the public health of the community.   This information from individual office visits by patients and UC agents, when combined with the aggregate data that Dr. Mehta prescribed the second most substances of any physician in the State of New York, supports the opinion that parts of Dr. Mehta's prescribing behavior and office behavior was not part of the legitimate practice of medicine."

27

WHEREFORE, based upon the foregoing, I respectfully submit that there is reasonable cause to believe that in or about March, 2010, through in or about September, 2010, in the Western District of New York, the defendant, PRAVIN V. MEHTA, did knowingly, intentionally and unlawfully distribute schedule II, III and IV controlled substances by the issuance of prescriptions in a manner inconsistent with the usual course of medical practice and for other than legitimate medical purpose in violation of Title 21, United States Code, Sections 841(a)(1), (unlawful distribution of a controlled substance) and further request that a Criminal Complaint in the form annex be issued.

Joseph Cowell
Investigator
Drug Enforcement Administration

Sworn to before me
January 26 , 2011

H. KENNETH SCHROEDER, JR.
United States Magistrate

28