**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

                      **v.**          **11-CR-268S(Sr)**

**PRAVIN V. MEHTA,**

        **Defendant.**
_____

## DECISION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #17.

## PRELIMINARY STATEMENT

The defendant, Pravin V. Mehta (defendant or "Dr. Mehta"), is charged in a twenty-eight count Indictment (Dkt. #16) with the distribution and dispensing of various controlled substances and the conspiracy to do so. Dr. Mehta also faces a forfeiture count. What follows is this Court's Decision and Order with respect to that portion of Dr. Mehta's pretrial motion seeking the suppression of statements he made during several investigative interviews. Dkt. ##50 and 63. Specifically, Dr. Mehta asserts that he was never told he had a right not to speak with the investigating officer and further that Dr. Mehta believed he was compelled to answer the officer's questions because he believed the circumstances of the interview had to do with issues relating to his license and employment. *Id*. For the reasons set forth below, this Court concludes

that an evidentiary hearing is necessary to determine whether Dr. Mehta's statements were voluntary within the meaning of the Fifth Amendment to the United States Constitution.

**FACTS**

As described in the Affidavit of United States Department of Justice, Drug Enforcement Administration, Buffalo Resident Office ("DEA-BRO") Diversion Investigator Joseph Cowell submitted in support of the Criminal Complaint, on November 13, 2009, the DEA-BRO initiated and coordinated a multi-agency joint investigation into Mehta and his medical practice. Dkt. #1, ¶ 7. The DEA-BRO had received complaints of excessive and unlawful prescribing of controlled substances by Mehta from area law enforcement agencies, including the New York State Police, Niagara County Sheriff Department-Drug Task Force, Niagara Falls Police Department, and the New York State Bureau of Narcotic Enforcement. *Id*. at ¶ 8. In his Affidavit, Diversion Investigator Cowell further stated:

> Historically, the BRO has received similar source and intelligence information concerning MEHTA's over-prescribing of controlled substance "painkillers" from medical professionals, pharmacists, and private individuals within Niagara and Erie Counties. Confidential sources and cooperating defendants have named MEHTA as a source of controlled substances where by [sic] a person can get any drug they want prescribed with little or no medical examinations, and that MEHTA is referred [sic] as "Dr. Feel Good."

*Id*. Thereafter, Investigator Cowell's Affidavit detailed the over year long investigation which included the review of data, consensually recorded office visits and the analysis of a medical expert retained to provide an opinion concerning whether the prescription

of controlled substances by Mehta during the consensually recorded office visits was consistent with the usual course of medical practice and whether the prescribing was for a legitimate medical purpose. *Id*.

In addition to the aforementioned investigative techniques, prior to any charges being filed against Dr. Mehta, Niagara Falls Police Department Detective Thomas Ewing made several unannounced visits to Dr. Mehta's Niagara Falls medical practice and engaged Dr. Mehta in conversations wherein Dr. Mehta made inculpatory statements. In his original motion, in a section entitled "Motion to Suppress Statements," Dr. Mehta reserved his right to seek suppression of statements and noted, "[w]e note that in an application for a search warrant it was claimed that a Niagara Falls Police Officer questioned Dr. Mehta regarding whether he presigned prescriptions prior to leaving the United States." Dkt. #41, p.7, n.1. Indeed, the Affidavit of Diversion Investigator Cowell submitted in support of the Search Warrant Application detailed two of the conversations that Niagara Falls Police Department detectives had with Dr. Mehta. The first such conversation detailed in the Cowell Affidavit took place on January 14, 2010 and was described by Diversion Investigator Cowell as follows,

> 42. On January 14, 2010, NFPD Detectives met with MEHTA at MEHTA'S office. MEHTA viewed copies of the previously issued/dispensed prescriptions purportedly issued by him between October, 2009 and January, 2010, for Alicia Sumers. MEHTA stated that he did not recognize the handwriting on the body of the prescriptions (name of patient, date of issuance, and drugs prescribed) as belonging to any of his employees. MEHTA claims the prescriptions were most likely forged even though he recognized that the signature on the prescriptions appeared to be his own. During my investigation of MEHTA, I have

> become familiar with MEHTA's signature. The signature on the prescription in the name of Alicia Sumers presented to the pharmacy by Bradley on January 13, 2010, appeared to [sic] MEHTA's genuine signature. Given that this prescription was presented around the time MEHTA had pre-signed prescription pads, and given Bradley's connection to the Figurellis, it is likely the prescription presented on January 13, 2010, was one of the "pre-signed" prescriptions. MEHTA stated that his prescriptions are normally filled out (body of the script) by staff members and then signed by himself. MEHTA stated that he did not examine MS. Sumers on the previous day, nor had Ms. Sumers been in the office that day.

Case No. 11-mj-40, Dkt. #1 at ¶ 42. The second conversation with Dr. Mehta detailed in Diversion Investigator Cowell's Affidavit took place on February 10, 2010,

> 46. On February 10, 2010, Detective Ewing asked MEHTA if he, MEHTA, had left any pre-signed prescriptions in the office prior to leaving for the trip to India. MEHTA paused, and after a few quiet moments, as if he were deciding how to respond, MEHTA stated, "possibly". [sic]

*Id*. at ¶ 46.

In its response to Dr. Mehta's original motion, the government stated,

> [t]he defendant did not make any statements to law enforcement officers during or after his arrest on January 27, 2011. In a footnote in his moving papers, the defendant notes that there was a conversation between law enforcement and the defendant during the course of the investigation. In fact, there were at least six such conversations, all occurring within Mehta's office, relating to scripts either bearing Mehta's true signature or a forgery of same. These statements are summarized as follows:

| Date | Summary of Statement | Subject | Reference |
|---|---|---|---|
| 1/14/2010 | Dr. Mehta viewed copies of the previously issued/dispensed prescriptions purportedly issued by him between October, 2009, and January, 2010, for Alicia Sumers. Dr. Mehta did not recognize the handwriting on the prescriptions as belonging to any of his employees. Dr. Mehta claimed the prescriptions were most likely forged even though the signature on the prescriptions appeared to be his own. Dr. Mehta stated that his prescriptions are normally filled out by staff members and then signed by himself. Dr. Mehta stated that he did not examine Ms. Sumers on the previous day, nor had Ms. Sumers been in the office that day. | Dawn Figurilli and Shannon Figurilli | Criminal Complaint 11-M-37<br><br>paragraph 10 |
| 2/09/2010 | Detective Ewing asked Dr. Mehta if he, Dr. Mehta, had left any pre-signed prescriptions in the office prior to leaving for the trip to India. Dr. Mehta paused, and after a few quiet moments, as if he were deciding how to respond, Dr. Mehta stated, "possibly". | Dawn Figurilli and Shannon Figurilli | Criminal Complaint 11-M-37<br><br>paragraph 20 |
| 01/13/2011 | Detective Thomas Ewing, NFPD, interviewed Pravin Mehta, at Mehta's office, concerning prescriptions that were purportedly signed by Mehta. Mehta viewed the HENDERSON prescription dispensed on November 23, 2010. Mehta signed an affidavit stating that he did not sign the prescription and that the prescription was a forgery. Further, Mehta informed Ewing that WILBERT HENDERSON was not a patient of his medical practice. | Wilbert Henderson | Criminal Complaint 11-M-31<br><br>paragraph 12 |

| | | | |
|---|---|---|---|
| 1/13/2011 | Detective Thomas Ewing, NFPD, interviewed Pravin Mehta, at Mehta's office, concerning prescriptions that were purportedly signed by Mehta. Mehta viewed the LONG prescription dispensed on November 10, 2010. Mehta signed an affidavit stating that he did not sign the prescription and that the prescription was a forgery. Further, Mehta informed Ewing that TERI LONG was not a patient of his medical practice. | Teri Long | Criminal Complaint 11-M-32<br><br>paragraph 10 |
| 1/13/2011 | Detective Thomas Ewing, NFPD, interviewed Pravin Mehta, at Mehta's office, concerning prescriptions that purportedly signed by Mehta. Mehta viewed the McHUGH prescription dispensed on November 24, 2010. Mehta signed an affidavit stating that he did not sign the prescription and that the prescription was a forgery. Further, Mehta informed Ewing that BARI McHUGH was not a patient of his medical practice. | Bari McHugh | Criminal Complaint 11-M-33<br><br>paragraph 10 |
| 1/13/2011 | Detective Thomas Ewing, NFPD, interviewed Pravin Mehta, at Mehta's office, concerning prescriptions that were purportedly signed by Mehta. Mehta viewed the RESPRESS prescription dispensed on November 23, 2010. Mehta signed an affidavit stating that he did not sign the prescription and that the prescription was a forgery. Further, Mehta informed Ewing that JAMES RESPRESS was not a patient of his medical practice. | James Respress | Criminal Complaint 11-M-39<br><br>paragraph 10 |

Dkt. #53, pp.7-9 (chart in original). As indicated by the government in the chart (reproduced above), the statements given by Dr. Mehta to Detective Ewing were used in various Criminal Complaints charging the following individuals, Dawn Figurelli, Shannon Figurelli, Wilbert Henderson, Teri Long, Bari McHugh and James Respress. In reply to the government's response wherein the government summarized the statements made by Dr. Mehta to Niagara Falls Police Department detectives, Dr. Mehta moved to suppress those specific statements. Dkt. #50, p.4-6. Specifically, Dr.

Mehta asserts,

> Dr. Mehta was never told that he had a right not to speak with the officer. As well, we believe that under the circumstances Dr. Mehta fully believed that under the circumstances that he was compelled to answer the officer's questions and to sign affidavits because he believed under the circumstances that the interview had to do with issues which implicated Dr. Mehta's licensing and employment. As a consequence, we believe that the statements attributed to Dr. Mehta were compelled and were not voluntarily given. In sum and substance, we believe that the statements were coerced by the activity of the officer in coming to Dr. Mehta's office and insisting that Dr. Mehta answer his questions and to provide various affidavits.
>
> The February 9, 2010 questioning is particularly illustrative. There, it is alleged that Det. Ewing, unannounced, came to Dr. Mehta's office and spoke to Dr. Mehta about pre-signed prescriptions and whether Dr. Mehta had left any pre-signed prescriptions in his office prior to leaving for India. It is alleged that Dr. Mehta paused, and after few moments, answered Det. Ewing's questions.
>
> That interrogation, under the circumstances, was clearly compelled as we have set forth above and, as a consequence, we believe that it is more than clear that Dr. Mehta's response to the Detective came as a result of the fact that he felt that he had no alternative but to respond to the questioning or face possible issues with regard to licensing and employment.

Dkt. #50, pp.5-6. Although the government filed a supplemental response to Dr. Mehta's motions (Dkt. #61), that supplemental response was limited to opposing Dr. Mehta's request for a *Franks* hearing concerning Dr. Parran's report and did not address the motion to suppress Dr. Mehta's statements. Thereafter, on February 15, 2013, Dr. Mehta filed an Affidavit in further support of his motion to suppress his statements. Dkt. #63. In his Affidavit, Dr. Mehta described that on three separate dates, January 14, 2010, February 9, 2010 and January 13, 2011 (three interviews) he

was interviewed by Detective Ewing. Dkt. #63, ¶ 3. Specifically, as described by Dr. Mehta, Detective Ewing arrived unannounced and indicated that he wanted to speak with Dr. Mehta. *Id*. at ¶ 4.

With respect to the conversations during each one of these visits by Detective Ewing, Dr. Mehta states,

> 6) [b]ecause of the manner in which the questions were put to me, I believe that I had no choice but to answer Investigator Ewing, specifically because I believed that my failure to answer his questions would lead to disciplinary proceedings which would be brought against me based upon my failure to respond to the detective's questions.
>
> 7) Det. Ewing indicated to me on numerous occasions, and on each of the occasions set forth above, that he wanted to speak with me about various matters. He never advised me that I had the right not to speak with him, nor did he ever indicate to me that my failure to do so would not lead to disciplinary actions or sanctions against me.
>
> 8) I was aware at that time, that licensing and disciplinary matters were conducted by the State of New York. As a police officer, I believed that Det. Ewing had the right to compel me to answer his questions at the risk of economic sanctions or the filing of disciplinary proceedings against me as a result of my failure to answer his questions.
>
> 9) On January 13, 2011 Det. Ewing came to my office unannounced and on each occasion indicated that he wished to speak with me with regard to some prescriptions. It is my recollection that he advised me that I had to sign an affidavit. I did so because I believed that I had no choice but to do so.
>
> 10) Because the questions put to me by Det. Ewing dealt with my medical practice and profession, it was my belief that I had no choice but to answer the detective's questions.

> 11) As a consequence, based upon conversations with my attorneys, I do believe that my statements were compelled and, as a result, I believe the statements are not admissible against me because, under the circumstances, the statements were immunized.

Dkt. #63, pp.2-3. Other than to summarize the conversations between the Niagara Falls Police Department and Dr. Mehta, the government has not provided a substantive response to Dr. Mehta's motion to suppress his statements. Accordingly, in the absence of any facts in the record submitted by the government to contradict the defendant's assertion that his statements were compelled (coerced) by Detective Ewing, this Court concludes that it must hold an evidentiary hearing to determine whether Dr. Mehta's statements to law enforcement during the investigatory phase of this matter were voluntary.

## DISCUSSION AND ANALYSIS

It is undisputed, that at the time Dr. Mehta was interviewed by Detective Ewing he was not in custody for purposes of the Fourth Amendment and therefore, he was not entitled to *Miranda* warnings. During oral argument, counsel for Dr. Mehta characterized this as a "*Garrity* issue" referring to the United States Supreme Court case *Garrity v. State of New Jersey*, 385 U.S. 493 (1967). Dkt. #62, p.37. In *Garrity*, the Supreme Court of New Jersey ordered that alleged irregularities in the handling of cases in municipal courts in certain New Jersey boroughs be investigated by the Attorney General and that a report of the investigation be provided to the court. Before being questioned, the police officers in *Garrity* were warned that anything they said

might be used against them in a criminal proceeding, that they had the privilege to refuse to answer if the disclosure would incriminate them and that if they refused to answer they would be subject to removal from office pursuant to New Jersey statute. The officers answered the questions, no immunity was given and each was convicted and the convictions were sustained over their protests that their statements were coerced because if they refused to answer they could lose their position in the department. In reversing the police officers' convictions, the United States Supreme Court stated,

> [t]he choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession under *Chambers v. State of Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, and related cases can be 'mental as well as physical'; 'the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'
>
> * * *
>
> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in Miranda v. State of Arizona, 384 U.S. 436, 464-465, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Garrity v. State of New Jersey,* 385, U.S. 493, 496-498 (1967) (internal citations omitted).

In order to be admissible, a confession must be free and voluntary. *Bram v. United States*, 168 U.S. 532, 542 (1897). A confession is voluntary when it is not "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of any improper influence." *Id*. at p.542-43. "Voluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). "Where the voluntariness of a statement is challenged, the government bears the burden of establishing by a preponderance of the evidence that the defendant's statements were 'truly the product of free choice.'" *Colorado v. Connelly*, 479 U.S. 157, 1168-69 (1986). As the Second Circuit has previously stated,

> the test of voluntariness [of a confession] is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . ." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L.Ed.2d 760 (1961).
>
> *United States v. Mast*, 735 F.2d 745, 749 (2d Cir. 1984) (citations omitted). There are various factors to be considered in making a determination of voluntariness - they include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation. *Id*.

*United States v. Okwumabua*, 828 F.2d 950, 952-53 (2d Cir. 1987).

Accordingly, as set forth above, in the absence of any facts in the record submitted by the government to contradict the defendant's assertion that his statements

were compelled (coerced) by Detective Ewing, this Court concludes that it must hold an evidentiary hearing to determine whether Dr. Mehta's statements to law enforcement during the investigatory phase of this matter were voluntary.  A status conference for the purpose of scheduling the evidentiary hearing shall be held on May 15, 2013 at 2:00 p.m.


DATED:	Buffalo, New York
	May 8, 2013


	*s/ H. Kenneth Schroeder, Jr.*
	**H. KENNETH SCHROEDER, JR.**
	**United States Magistrate Judge**